**UNITED STATES of America, Plaintiff,**

v.

**AFRAM LINES (USA),
LTD., in personam,**

**and**

**Tug El Gato Grande and Barge Tide–Mar 300, their engines, tackle, apparel, etc., in rem, Defendants.**

Nos. 91 Civ. 0068 (JFK), 90 Civ. 6155 (MP), 90 Civ. 6850 (DLC), 91 Civ. 0898 (RLC), 91 Civ. 1756 (MBM), 91 Civ. 1757 (JSM), 91 Civ. 1758 (JSM), 91 Civ. 2267 (RWS), 91 Civ. 3700 (DLC), 91 Civ. 4063 (AGS), 91 Civ. 5284 (KMW), 91 Civ. 5684 (CSH), 91 Civ. 8028 (PKL), 92 Civ. 1203 (JFK), 92 Civ. 1328 (PKL) and 92 Civ. 1450 (PKL).

United States District Court, S.D. New York.

Dec. 9, 1994.

Joan L. Califf, Mark E. Schaefer, Asst. U.S. Attys., U.S. Dept. of Justice, New York City, for Government.

Edward A. Keane, Mahoney and Keane, James E. Forde, Standard Weisberg, P.C., New York City, Thomas L. Tisdale, Southport, CT, Todd Kenyon, Healy & Baillie, R. Saltz, Dougherty, Ryan, Giuffra, Zambito & Barra, New York City, for defendants.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The discovery motions now pending before the Court raise two questions with broad implications. First, when is an agent of a party a "managing agent" who is subject to deposition by notice and whose testimony is binding upon its principal? Second, when is a party obligated to seek discovery by means least costly to its adversary?

*Background*

The current discovery disputes arise out of approximately fifty related cargo damage and loss cases that have been consolidated for purposes of discovery. Each case involves the shipment of goods by a voluntary relief agency such as Catholic Relief Services or CARE. The voluntary relief agencies assigned their claims to the United States Government, which is therefore the plaintiff in all of the actions. The Government in turn sued the carrier for each voyage, Afram Lines (USA), Ltd., or Afram (International), Inc., as well as each vessel involved (collectively referred to as "Afram").

With the cooperation of the parties, the Court selected fifteen bellwether cases to proceed to trial. Discovery has been held in abeyance in the remaining cases in the expectation that resolution of the bellwether cases may encourage settlement of the rest. Pretrial preparation in the bellwether cases was bifurcated between domestic discovery and overseas discovery. The latter included document production, face-to-face depositions, and depositions conducted by telephone. All discovery in the bellwether cases has closed.

The Government now moves pursuant to Rule 37 of the Federal Rules of Civil Procedure for an order striking the defendants'

answers and granting other forms of relief on the ground that Afram failed to produce witnesses for deposition overseas pursuant to notice. Specifically, the Government argues that the port agents and surveyors that it noticed for deposition were managing agents of Afram and so were required to appear. Afram contends that these witnesses were independent contractors and not its managing agents, and so could only be compelled to appear pursuant to the procedures of the Hague Convention or other applicable treaties providing for discovery abroad.

Afram has cross-moved pursuant to Rule 15 of the United States District Courts for the Southern and Eastern Districts of New York for reimbursement of costs that it incurred in certain overseas depositions. Afram contends that these depositions, noticed by the Government, were unnecessary since the same information could have been obtained by means of notices to admit.

For the reasons set forth below, the Government's motion and Afram's cross-motion are both denied.

*Depositions of Port Agents*

Early in the pretrial phase of these cases it was apparent that there would be a dispute over whether the parties had sufficient ties with certain non-party witnesses to ensure their cooperation in discovery. The Government took the position that it had no control over the voluntary agencies, while Afram contended that it could not direct the actions of its port agents. Accordingly, during a pretrial conference in 1992, I issued an oral admonition that the parties use their best efforts to secure the cooperation of these non-parties in order to reduce costs and facilitate discovery. The Government was more successful in this endeavor. Not only did it produce documents from the voluntary agencies, but it also secured at Afram's request depositions of certain marine surveyors in Mozambique. Affidavit of Mark E. Schaefer dated July 15, 1994, at ¶¶ 9, 10 & Exh. B & C. Afram produced documents from its shipping agents and surveyors, but when served with notices of deposition for these witnesses, it indicated that they were not within its control.

Specifically, on January 24, 1994, the Government noticed the deposition of Anfrena, Afram's agent in Maputo, Mozambique. Schaefer Aff. at ¶ 12 & Exh. G. By letter dated January 24, 1994, Afram's counsel indicated that Anfrena was a Mozambique government agency beyond its control, and suggested that any deposition of that agency be conducted pursuant to the Hague Convention. Schaefer Aff., Exh. D. Similarly, on March 25, 1994, the Government noticed the depositions of Depat Marine Surveys, Ltd., a marine surveyor in Ghana; Sierra Leone Shipping Agency, Ltd., a port agent in that country; Sumaco, a port agent in Cote d'Ivoire; and Westgate Shipping Co., a port agent in Ghana. Schaefer Aff., Exh. H. Each of these depositions was noticed to take place in Abidjan, Cote d'Ivoire. Then, on April 20, 1994, the Government served notices for the deposition of Milne Servicios Maritimos, S.A., to be taken in Lima, Peru, and for the deposition of Maritima Dominicana S.A. to be taken in Santo Domingo, Dominican Republic. Schaefer Aff., Exh. I. In response, counsel for Afram wrote to the Government's attorney as follows:

> As we stated in Mozambique and West Africa, the groups which attended "the vessels at the discharge ports as local agents are not the defendants" and, therefore, are not the proper subject of a Notice of Depositions of the defendant. We do not control these entities nor is this testimony of the defendant. If you had wished to take their depositions, you should have compelled their attendance through the Hague Convention or other process.

Schaefer Aff., Exh. L.

The Government has presented evidence that at about the time the deposition notices were served, Afram listed Anfrena, Westgate, Sierra Leone Shipping, and Maritima Dominicana among its agents. Schaefer Aff., Exh. J. Further, the Government has made the following general representations about shipping agents:

> Historically, overseas agents represent the interests of their principals in the conduct of operations in overseas ports. Their duties include engaging stevedoring services and other ancillary port services,

maintenance of the principal's vessels, as necessary, including repairs, bunkering (provision of fuel), and victualling (provision of supplies), and other duties, such as crew welfare.

Schaefer Aff. at ¶ 13.

The Government has also provided specific documentation of services rendered by the agents. For example, Maritima Dominicana, Westgate, and Sumaco each contracted for surveys and stevedore services. Schaefer Aff., Exh. K–1, K–2. Sumaco purchased material for vessel repairs. Schaefer Aff., Exh. K–3. Sumaco and Westgate contracted for fuel. Schaefer Aff., Exh. K–4. Westgate arranged for transshipment of cargo. Schaefer Aff., Exh. K–5. Westgate and Maritima Dominicana supervised discharge of Afram vessels. Schaefer Aff., Exh. K–6. Westgate attended berthing meetings where it was decided which stevedoring companies would service which vessels. Schaefer Aff., Exh. K–7. Sumaco represented Afram in negotiating a customs dispute. Schaefer Aff., Exh. K–8. Sumaco and Maritima Dominicana communicated on Afram's behalf with consignees. Schaefer Aff., Exh. K–9. Sumaco investigated obtaining cargo for shipment on Afram vessels and inspected vessels that Afram considered chartering. Schaefer Aff., Exh. K–10, K–11. Finally, Westgate arranged for medical services for Afram crews and engaged watchmen for Afram vessels. Schaefer Aff., Exh. K–12, K–13.

In response to the Government's contentions, Afram has relied on the affidavit of Joe E. Mendez, President of Afram Carriers, Inc., successor to Afram Lines (USA), Ltd. Addressing first the current status of the port agents, Mr. Mendez stated that with regard to the list of agents that the Government relies on,

> [t]hese companies were each listed in the publication in the event that Afram Carrier booked cargo to these destinations. In that case, Afram Carriers *might* retain these companies as port agents, if an agreement could be reached at that time. Afram Carriers' list includes approximately 100 or more different agents.

Affidavit of Joe E. Mendez dated Aug. 12, 1994, at ¶ 6 (emphasis in original). Thus, for example, since 1991, neither Anfrena nor Maritima Dominicana have been employed by Afram as port agents, despite the fact that they are included on the list. Mendez Aff. at ¶¶ 4, 5.

Mr. Mendez went on to explain Afram's relationship with its port agents:

> [S]mall ocean carriers, such as Afram Carriers and Afram (USA), maintain a main office where all of the business functions of the company are carried out, including vessel operations. In order to tend to the needs of the vessel and to assist the operations department, Afram Carriers (and most all other steamship companies) hire port agents to assist them on a voyage by voyage basis at the ports of loading and discharge. Generally, these port agents are provided with funds on account prior to the arrival of the vessel, and they are asked to carry out specific tasks for the steamship company. However, they make no decisions nor are they authorized to make decisions on behalf of the steamship company. Rather, they report and advise on the status of the operations being conducted at that port and tend to the needs of the vessel as directed by the master of the vessel, consisting of such things as providing the vessel with supplies as requested by the vessel's officers, hiring stevedores as directed by the operations department of the shipping company, arranging for the supply of fuel but only upon the request of the vessel's offices and specific authority from the steamship company concerning price and amount, and other tasks.

Mendez Aff. at ¶ 7. The port agents are paid on a job by job basis and are not on Afram's payroll. Mendez Aff. at ¶ 8. Further, a port agent who may perform work for Afram also services vessels on behalf of other steamship companies. Indeed, in some instances there is an exclusive port agent who tends all commercial vessels in that port. Mendez Aff. at ¶ 9. Mr. Mendez concluded that

> All of the shipping agencies hired by Afram (USA) and Afram Carriers have carried out only the specific functions requested by Afram (USA) or Afram Carriers or by the particular vessel's officers. None of

these port agents have ever been provided with any general authority to act on behalf of Afram (USA) or Afram Carriers....

Mendez Aff. at ¶ 10.

### Costs of Overseas Discovery

The Government did conduct numerous depositions overseas. These took place in Maputo, Mozambique; Abidjan, Cote d'Ivoire; Santo Domingo, Dominican Republic; and Lima, Peru. According to Afram's counsel, this deposition testimony consumed thirty-three days and fills 1,100 pages of transcript. Declaration of James E. Forde dated Aug. 15, 1994, at ¶ 4. One or more of Afram's attorneys attended these depositions in person, except for those in Lima, which they attended by telephone.

Afram now moves for reimbursement of its costs, including attorneys' fees, for all of these depositions except those held in Maputo.[1] Afram contends that the depositions were unnecessary because they were primarily concerned with the authentication of documents, a function more efficiently performed through a request for admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure. Afram does not seek to be compensated for the Maputo depositions, reasoning that they were a "learning experience" for the Government.

### Discussion

#### A. Status of Port Agents

##### 1. Estoppel

■ Two preliminary issues must be dealt with before reaching the question of whether Afram's port agents are subject to deposition pursuant to notice. First, Afram contends that the Government's position should be rejected out of hand because of its delay in filing its motion. Afram notified the Government early in the litigation of its objections to producing the port agents voluntarily, and its reiterated these objections when the Government served formal deposition notices. It now complains that the Government waited until the close of discovery to present this issue to the Court.

The Government, however, met the court-imposed deadline for filing motions related to discovery. To the extent that Afram is basing its argument on an estoppel theory, a necessary element is prejudice to the party asserting estoppel. *See Margate Industries, Inc. v. Samincorp, Inc.,* 582 F.Supp. 611, 618–19 (S.D.N.Y.1984); *Deutsch v. Health Insurance Plan of Greater New York,* 573 F.Supp. 1433, 1440 (S.D.N.Y.1983); *United States v. Bedford Associates,* 491 F.Supp. 851, 867 (S.D.N.Y.1980), *aff'd in pertinent part,* 657 F.2d 1300 (2d Cir.1981), *cert. denied,* 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Here, Afram has asserted no such prejudice.

Finally, the Government's delay is justified to some degree by the need to collect evidence to support its motion. Whether a proposed deponent is a party's managing agent depends upon a close analysis of the facts in each case. The Government could not have filed its motion immediately upon Afram's announcement that it would not produce its port agents for deposition pursuant to notice. Thus, the Government is not estopped from bringing its motion at this time.

##### 2. The Court's "Directive"

■ Equally unavailing is the Government's argument that it should prevail solely on the basis that Afram violated a court "directive" to obtain the voluntary cooperation of the port agents. First, I issued no such order, but only encouraged counsel to take steps that would expedite discovery, including obtaining the assistance of non-party witnesses. Second, even if I had issued a compulsory directive orally, the failure to reduce it to writing would have rendered it unenforceable. Rule 72(a) of the Federal Rules of Civil Procedure provides for the issuance of written orders by magistrate judges and establishes rules for appeal from such orders. The issuance of an off-the-record, oral directive would deprive the parties of any opportunity for an appeal. Third, even if I had issued a valid order along the lines suggested by the Govern-

---

**1.** Although Afram's Notice of Motion does not refer to the Santo Domingo depositions, the sup- porting affidavit does.

ment, Afram has complied at least to the extent of producing to the Government documents from some of the port agents. For all these reasons, the Government may not rely solely on the court "directive."

### 3. Managing Agents

■ Only a party to litigation may be compelled to give testimony pursuant to a notice of deposition. If the party is a corporation, it may be noticed pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, in which case it must designate an officer, director, or managing agent to testify on its behalf. Alternatively, the party seeking the deposition may identify a specific officer, director, or managing agent to be deposed and notice that person under Rule 30(b)(1). The testimony of such a person will be binding on the party. However, a corporate employee or agent who does not qualify as an officer, director, or managing agent is not subject to deposition by notice. *See GTE Products Corp. v. Gee,* 115 F.R.D. 67, 68–69 (D.Mass. 1987); *Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 169 (S.D.N.Y. 1985). Such a witness must be subpoenaed pursuant to Rule 45 of the Federal Rules of Civil Procedure, or, if the witness is overseas, the procedures of the Hague Convention or other applicable treaty must be utilized.

Whether a person is a party's "managing agent," and therefore subject to deposition on notice, has been said to depend on several factors:

1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual *"respecting the matters involved in the litigation,"* Kolb v. A.H. Bull Steamship Co., 31 F.R.D. 252, 254 (E.D.N.Y.1962) (emphasis in original); and 5) whether the individual

can be expected to identify with the interests of the corporation.

*Id.* at 170 (citation omitted). Although this analysis is couched in terms of an individual employee, it is fully applicable to cases like this where the agent is a corporate entity rather than an individual and an independent contractor rather than an employee.

The identification of a managing agent in any given case is fact-sensitive. "[B]ecause of the vast variety of factual circumstances to which the concept must be applied, the standard ... remains a functional one to be determined largely on a case-by-case basis." *Founding Church of Scientology of Washington, D.C., Inc. v. Webster,* 802 F.2d 1448, 1452 (D.C.Cir.1986) (citation omitted), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). Thus, "the question of whether a particular person is a 'managing agent' is to be answered pragmatically on an ad hoc basis...." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2103, at 376 (1970); *see also* 4A *Moore's Federal Practice* ¶ 30.51, at 30–47 to 30–48 (1994). Whether a proposed deponent falls into a particular category of employees or agents is therefore less relevant than the individual's specific functions and authority.

■ The caselaw provides somewhat ambiguous guidance with respect to the burden of proof for demonstrating managing agent status. Generally, the burden is on the discovering party to establish the status of the witness. *See Sugarhill,* 105 F.R.D. at 170; *Proseus v. Anchor Line, Ltd.,* 26 F.R.D. 165, 167 (S.D.N.Y.1960); 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2103, at 380 (1970). At the same time, however, in pretrial proceedings courts resolve doubts in favor of the examining party. *See Sugarhill,* 105 F.R.D. at 171; *Tomingas v. Douglas Aircraft Co.,* 45 F.R.D. 94, 97 (S.D.N.Y.1968). Thus, it appears that the examining party has the burden of providing enough evidence to show that there is at least a close question whether the proposed deponent is a managing agent.

The concept of resolving cases that fall into the "grey area" in favor of the examining party is most rational in two circumstances.

First, if the examining party has not obtained full discovery from its adversary on the status of the proposed deponent, it is proper to defer a final determination of that status. Second, it promotes judicial economy to proceed with a deposition by notice when the only pretrial consequence of determining the deponent's status is whether he will be served with a subpoena and tendered a witness fee. For example, since a current employee of a party is within that party's practical control, it is often sensible to require the employee to appear pursuant to notice while deferring the question of whether his testimony will bind the employer.

The case for tilting in favor of the examining party is less strong, however, where that party has had complete discovery of its opponent or where the proposed deponent is not an employee of the opponent and may, in fact, be beyond its control. That is the case here. Afram presumably has as much information about its relationship with its agents as do the agents themselves, and the Government has had full opportunity to take discovery from Afram. Further, Afram does not have the evident control over the overseas agents that an employer has over employees. Therefore, the consequence of requiring depositions pursuant to notice here is not merely the waiver of formal subpoena procedures; rather, Afram could be sanctioned for failing to produce witnesses who are in fact beyond its control.

A final threshold question is at what point in time must the proposed deponent have been the party's managing agent in order to be subject to deposition by notice. In *Boston Diagnostics Development Corp. v. Kollsman Manufacturing Co.*, 123 F.R.D. 415, 415–16 (D.Mass.1988), the court ordered the deposition of an individual who had previously been employed by the party served with the notice but who was now employed only by a related corporation. This result was criticized by the court in *Reed Paper Co. v. Procter & Gamble Distributing Co.*, 144 F.R.D. 2 (D.Me.1992), which found it inconsistent with the language of Rule 32(a)(2), which refers to the deposition of a party or of "anyone who *at the time of taking the deposition* was an officer, director, or managing agent. . . ." *Id.* at 5 n. 3 (emphasis added). In *Reed*

*Paper,* the court found the separate corporate identities of the witness' present and former employer to be dispositive. *Id.* at 4–5 & n. 2.

The better approach is a practical one that focuses not only on the formal connection between the witness and the party at the time of the deposition, but also on their functional relationships. Thus, in the *Church of Scientology* case the court found that although the witness had nominally relinquished his role as the party's principal, he continued to possess "ultimate control." 802 F.2d at 1455–57. This was consistent with the observation that:

> Courts have accorded managing agent status to individuals who no longer exercised authority over the actions in question (and even to individuals who no longer held any position of authority in the corporation), so long as those individuals retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests.

*Id.* at 1456 (citations omitted). Thus, the witness' continuing ability to utilize the party's organs of communication, *see id.* at 1455–56, and his access to the party's confidential documents, *see Kollsman,* 123 F.R.D. at 416, are among the relevant considerations to be taken into account to determine if managing agent status has persisted to the date of deposition.

When this analytic framework is applied to the facts of this case, it is apparent that the Government has failed to provide sufficient evidence that Afram's port agents or surveyors function as managing agents. The Government has provided no details whatsoever of the relationship between Afram and Depat Marine Surveys, Ltd. The only evidence that it has provided with respect to Anfrena, Sierra Leone Shipping Agency, Ltd., and Milne Servicios Maritimos, S.A., is that these entities were listed by Afram as its agents.

Even with respect to those port agents as to which the Government supplied specific information—Sumaco, Westgate, and Maritima Dominicana—application of the five-factor test leads to the conclusion that they are not managing agents of Afram. The consideration most favorable to the Government is

the fourth factor: the general responsibilities of the port agents regarding the matters in the litigation. The port agents indisputably had wide-ranging responsibilities. Furthermore, many of their duties such as arranging for stevedoring services may be directly related to claims of cargo loss or damage. However, the scope of an agent's responsibility is insufficient by itself to establish managing agent status. Afram's counsel draw an apt analogy: travel agents often have broad responsibilities to arrange a client's transportation, accommodations, entertainment, and even meals, yet it is doubtful that they would be accorded sufficient discretion to be considered the client's managing agent.

This leads back to the first factor in the analysis: whether the agent has general powers to exercise judgment in corporate matters. On this issue, the Government has failed to rebut Afram's evidence that the port agents had no authority to exercise discretion, but only acted at the direction either of Afram's home office or of the master of one of Afram's vessels. Thus, for example, while a port agent might arrange for bunkering of a vessel, it could only buy the quantity of fuel ordered by Afram at the price approved by Afram.

The second factor is whether the witness can be relied on to give testimony at the request of the party with which it is affiliated. To some extent, the analysis called for by this consideration is circular: if the witness is a managing agent, he can be relied on to testify because he is required to do so by Rule 30(b)(2). There are, however, considerations external to the principal-agent relationship that are pertinent to this issue. For example, in this case at least one of the port agents, Anfrena, is an entity of a foreign government, and is therefore unlikely to be relied upon to give testimony at Afram's request. On the other hand, an agent's history of cooperating with a party in discovery may be probative of the party's ability to rely on the agent to testify. *See Sugarhill*, 105 F.R.D. at 171 (witness previously submitted affidavit on behalf of party). Here, although the port agents have supplied documents at Afram's request, there has been no showing that they ever provided sworn testimony for Afram without being required to do so by subpoena or other formal process.

The third factor is whether there are persons employed by the corporation in positions of higher authority with regard to the subject matter of the proposed deposition. In admiralty cases, the ship's master is often found to be the exclusive managing agent with respect to a voyage, notwithstanding the fact that individual crew members or agents might possess more information about the specific events at issue. *See, e.g., Santiago v. American Export Lines, Inc.*, 30 F.R.D. 372, 373–74 (S.D.N.Y.1962). Here, both the masters of the respective vessels and Afram officers in the corporate headquarters had more authority than the port agents with regard to the duties performed by those agents. Thus, it is these other witnesses that either were or could have been deposed on behalf of Afram pursuant to notice.

The last factor is whether the witness may be expected to identify with the interests of the party. Such identification of interests is unlikely here. Afram and the port agents do not even stand in an employer-employee relationship. Moreover, the agents may represent numerous shipping companies, some of which may at times have interests antagonistic to Afram's. Finally, the agent's interests even with respect to the issues involved here may be adversarial to Afram's, since cargo damage or loss might be attributable to negligence by the agents in performance of their duties.

Each of the factors, then, except for the breadth of the agents' responsibilities, points strongly against characterizing them as managing agents. This is true even if the agents' status at the time they performed work for Afram is assumed to have continued to the date of deposition. The Government has failed to carry its burden even to the point of demonstrating the existence of a close question as to the status of the port agents, and its motion is therefore denied.

### B. Discovery Costs

█ Rule 15(a) of the Local Civil Rules of this Court provides:

When a proposed deposition upon oral examination, including a deposition before action or pending appeal, is sought to be taken at a place more than one hundred

**416**

(100) miles from the courthouse, the court may provide in the order or in any order entered under Rule 30(b), Federal Rules of Civil Procedure, that prior to examination, the applicant pay the expense of the attendance including a reasonable counsel fee of one attorney for each adversary party at the place where the deposition is to be taken. The amounts so paid, unless otherwise directed by the court, shall be a taxable cost in the event that the applicant recovers costs of the action or otherwise.

Afram argues that it should be entitled to compensation under Local Rule 15 for all overseas depositions conducted by the Government except those held in Mozambique. It claims that these depositions served no purpose except to authenticate documents, a goal that could have been achieved at far less cost had the Government simply served Afram with requests for admissions.

The Government raises a number of counterarguments, most of which need not be fully addressed. For example, the Government contends that the overseas depositions obtained information well beyond the simple authentication of documents, a position largely supported by a review of the transcript excerpts. Likewise, the Government argues that Local Rule 15 permits cost-shifting only in advance of a deposition, not after the deposition has been held. It need not be determined whether Local Rule 15 must be read quite so strictly or if there is other authority for shifting costs after the deposition has already occurred.

Even if there is flexibility to require compensation after the fact, this case provides an excellent illustration of why such relief should be granted only in exceptional situations. According to Afram, the Mozambique depositions were a "learning experience," after which the Government should have been aware that the same information could be obtained by less costly means. But Afram was also presumably educated by these same depositions. Thereafter it could have moved promptly for an order requiring the Government to advance costs for future overseas depositions. This would have permitted the Government to make a cost-benefit analysis and decide whether to pursue the depositions or elect some other means of discovery. Indeed, when Afram raised the general issue of the expense of the depositions in Peru, I authorized Afram's counsel to attend by telephone and thus reduce their costs.

Yet Afram never sought an order in advance of the depositions shifting costs to the Government. Having failed to give the Government a chance to choose a different means of discovery and having failed to provide the Court with the opportunity to devise cost-efficient alternatives, Afram can not now be heard to argue that it is entitled to reimbursement for a waste of resources that it might have prevented.

*Conclusion*

For the reasons set forth above, the Government's motion for sanctions for Afram's failure to produce witnesses for depositions overseas is denied. Afram's cross-motion for an award of costs for attendance at certain overseas depositions is likewise denied.

SO ORDERED.